

**FILED**

**11/08/2021**

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

Roy Edward Ates, Jr.
Claimant/Plaintiff, pro se
Reg. #88531-380
U.S. Penitentiary Terre Haute
PO Box 33
Terre Haute, IN 47808

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
(TERRE HAUTE DIVISION)

| | | |
|---|---|---|
| ROY EDWARD ATES, JR.,<br>          Claimant/Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br>          Respondent/Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:21-cv-00418-JPH-MG<br>Civil Case No.: <u>To Be Assigned</u><br><br>**INITIAL COMPLAINT UNDER THE<br>FEDERAL TORT CLAIMS ACT<br>(28 USC §1346 et. seq.)<br>FOR CLAIMS AGAINST THE<br>UNITED STATES OF AMERICA** |

COMES NOW, Roy Edward Ates, Jr., the claimant/plaintiff (Claimant) in this matter, pro se, and does hereby submit this initial complaint under the Federal Tort Claims Act (FTCA), 28 USC §1346 et. seq., for claims against the United States of America. This civil action involves liability of the United States of America for acts or ommissions of employees of the government; in this matter the concerned agency is the Federal Bureau of Prisons (FBOP) - Specifically the FBOP's Federal Correctional Complex Terre Haute, located at 4700 Bureau Road South, Terre Haute, IN 47802.

## I. <u>INITIATION OF CIVIL ACTION</u>

A civil action is commenced by filing a complaint with the court. <u>Fed.R.Civ.P.Rule 3</u>. Claims under the FTCA need not be on any form. <u>Myles v United States</u>, 416 F.3d 551 (7th Cir.(7/20/2005)) It is only necessary that the complaint contain properly plead factual allegations.

(1)

## A. Liberal Construance

"[A] document filed pro se is to be liberally construed, and a pro se complaint, however inartfully plead, must be held to a less stringent standard than formal pleadings drafted by lawyers." Erickson v Pardus, 167 L.Ed. 1081 (2007) The liberal construction afforded pro se filings "relates to both the pro se plaintiff's factual allegations and their legal theories" White v City of Chicago 2016 U.S. Dist. LEXIS 107438 (NDIL(8/15/16))

## II. SUBMISSION OF SUM CERTAIN CLAIM TO APPROPRIATE FEDERAL AGENCY

### A. Claim Submission

The Claimant submitted an administrative claim for personal injury to the Federal Bureau of Prisons, North Central Regional Office, 400 State Ave., Tower II, Suite #800, Kansas City, Kansas 66101, on or about February 2, 2020.

The Claim presented a completed "Standard Form 95, Claim for Damage, Injury, or Death." The claim also presented five (5) additional attached pages (totalling seven (7) pages) which further expounded on Form sections: 8. Basis of Claim, 10. Personal Injury/Wrongful Death, and 11. Witnesses-Name. The claim was specific in detail (including incorporation by reference a sufficient evidentiary basis) to allow the FBOP and a "legally sufficient reader," sufficient notice for the agency to investigate the claim before litigation. The claim substantially complied with the administrative procedural requirements of 28 CFR §§172 and Part 14 et. seq.

(2)

## B. Federal Agency Review and Denial

The Office of Regional Counsel provided acknowledgement of receipt and consideration on behalf of the governmental agency on May 19, 2021. The memorandum documented that the claim was transmitted via the United States Postal Service, certified mail no: 7018 3090 0002 1667 5759. Further, the claim was assigned "Administrative Claim Number TRT-NCR-2021-03000."

The May 19, 2021, memorandum states that the referenced tort claim has been considered for administrative review and that an investigation was conducted. It concluded that the investigation of claim did not reveal a basis supporting settlement.

Accordingly, the claim was denied. The memorandum serves as a notification of final denial under 28 CFR §14.9 - Final Denial of Claim.

Claimant dissatisfaction with this agency action allows for filing of a suit not later than six months after the date of mailing of the denial.

The civil action for judicial review is timely filed.

## C. Sum Certain Claim for Damages

The agency memorandum correctly identified the amount of Sum Certain Claim for Personal Injury damages at $2,500,000.00 (two-million, five hundred thousand dollars and zero cents in US Federal Reserve Note (Dollars))

The Claimant is entitled to reasonable compensation, which means a sum as would reasonably compensate the victim both for injuries and for pain and suffering. To that sum shall be added past, present, and future expenses and losses reasonably necessary to the claimant's treatment.

(3)

## 1. Newly Discovered Evidence or Intervening Facts

The Claimant intends to request increased sum certain claim for damages amount due to the medical condition & physical debilitations not identified until after presentment & denial of claim.

The claim contained notice of pending medically necessary evaluations and treatments that were being withheld/delayed by agency employees. "At no time did medical staff evaluate the claimant as reuqested(sic). No medical care has been provided for the lung damage and related issues as of the date of this submission." (Claim @ Pg. 6 of 7)

## III. 28 USC §1915A

Section 1915A, directs the court to review the complaint according to the following subsections: (a) Screening of complaint against federal government. The Court shall review, before docketing if feasible or, in any event as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity.

Further, (b) identifies grounds for dismissal. On review the court shall identify cognizable claims, or dismiss the complaint, but only if: (1) it is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief.

Pursuant to Rule 4(e) of the Fed.R.Civ.P., if the complaint is not dismissed, the clerk is to complete on plaintiff's behalf the summons and forms USM-285 for service on the United States. Rule 4(i) states: Service is to be to local United States' Attorney and Attorney

General of the United States in Washington, D.C. The Service is to include a copy of the summons, complaint, and any initial memorandums and orders.

## IV. 28 USC §1915

This section governs proceedings in forma pauperis. Subsection (a)(1) states: Subject to subsection (b) any court of the United States may authorize the commencement, prosecution, or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such [person] prisoner possesses that the person is unable to pay such fee or give security therefor. Such affidavit shall state the nature of the action, defense, or appeal and affiant's belief that the [person] prisoner is entitled to redress.

The Claimant is financially unable to prepay the filing fees. In addition, the Claimant has no assets. The Claimant intends to proceed in forma pauperis and has submitted a motion requesting such permission contemporaneously with this complaint. Submission of the appropriate financial affidavit will occur upon receipt from the Clerk of Court with submission to include the six-month inmate trust fund account print-out.

This Claimant has not previously received a "strike" for filing frivolous or malicious, etc., civil actions in any district court.

The Claimant has also not previously litigated this civil action, or any of the underlying factual matters, in any prior complaint in any district court.

(5)

## V. 28 USC §1391

Section 1391- Venue Generally- giverns proper venue determinations. Subsection (a)(1) states: This section shall govern the venue in all civil actions brought in the district courts of the United States. Part (2): The proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

The applicable subsection to this civil action is §1391(e), which states in relevant part: Actions Where Defendant is Officer or Employee of United States Part (1) In General - a civil action in which a defendant is... the United States may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or ommissions giving rise to the claim occurred, or (C) the plaintiff resides if no real property is involved in the action.

This district court is an appropriate venue as the United States is the sole defendant, its concerned federal agency, the FBOP (FCC TH), is located in this judicial district, the entirety of the acts or ommissions giving rise to the claim occurred therein, and the plaintiff is a resident of same; no real property is involved in the action.

## VI. JURISDICTIONAL QUESTIONS
### A. Subject-Matter Jurisdiction

The question of if this district court has the appropriate subject matter jurisdiction can be affirmed under various legislative authority.

Title 28 of the Code of Federal Regulations, section 14.9(a), refers judicial review of a claimant's dissatisfaction of an agency response to an appropriate district court. This district court is

(6)

appropriate because: (1) 28 USC §1346(b) provides that a federal court has jurisdiction on claims against the United States, for... personal injury or death caused by negligent or wrongful acts or ommissions of any employee of the government while acting within the scope of [their] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or ommission occurred; (2) §1346(b)(1) clarifies that "district courts have original jurisdiction of civil claims against United States." See Smith v Sessions, 2018 U.S. Dist. LEXIS 122345 (NDIL(7/23/18)); Subject-matter jurisdiction also falls under 28 USC §1331, Federal Question: The District Courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States. Baymont Franchise Systems v. Jannat Props. LLC, 2021 U.S. Dist. LEXIS 88289 (NDIL(5/10/21)) The Court can consider and decide cases that involve violations of federal law or the federal constitution, referencing §1331 in Murphy v USP, 2021 U.S. Dist. LEXIS 18347 (EDWI(2/1/21)).

### B. Personal Jurisdiction

In determining whether personal jurisdiction exists, we accept all well-pleaded allegations in the complaint as true. See Rubik's Brand, LTD. v p'shops & Unincorporated Ass'n Identified on Schedule A, 2021 U.S. Dist. LEXIS 40755 (NDIL(3/4/21)), "In a federal question case such as this one, a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant."

This civil action is a complaint for damages arising from personal injury caused by negligence or wrongful acts of government employees

by which the United States would be liable under Indiana law pursuant to federal law, i.e. - the FTCA. This court also sits in a jurisdiction where both federal and state law allow for service of process on the defendant, i.e. - the United States of America.

Personal jurisdiction might also be invoked under governing Indiana law. The court shall apply the State's law of personal jurisdiction as the requirement of "continuous and systematic" contact among plaintiff, defendant, and tortious conduct occurred within the forum state, i.e. - Indiana.

### C. Damages Claim Amount in Controversy
### 1. Curing or Waiver of Defects

28 USC §1406(a) allows that, if it be in the interest of justice, transfer to any district or division where the tortious conduct occurred can be ordered by the district court in which the civil action was filed.

Claimant requests the same consideration if the sum certain claim for damages exceeds the amount over which this court can exercise its jurisdiction.

### VII. FACTS SUPPORTING CLAIM
### A. Overview

The claimant is pursuing damages from the United States of America for the injuries sustained as a result of the negligent acts or ommissions of employees of the Federal Bureau of Prisons at Federal Correctional Complex Terre Haute. The FCC TH employees (FCC TH) had a duty to protect the health and welfare of the Claimant and failed to do so. In addition, the employees were charged with providing adequate and timely medical care of certain physical injuries arising from the negligent acts and ommissions. Each resulting injury outlined below was

(8)

both foreseeable and preventable and cause by a specific breach of duty.

Each allegation is based on the facts and belief of the claimant.

## B. Facts Creating Claims

On March 13, 2020, then-President Donald Trump declared a national emergency concerning the coronavirus pursuant to the World Health Organization (WHO) labelling it a global pandemic on March 11, 2020. SARS-CoV-2 (Severe Acute Respiratory Syndrome Coronavirus 2), is the cause of Covid Disease 19, and is commonly called Covid-19 (Covid). Covid is a potentially lethal disease for which there is no known cure, inflicts a variety of long-term adverse health consequences, and was and is mutating into more virulent strains.

On April 1, 2020, the Director of the Federal Bureau of Prisons implemented modified operations at all FBOP facilities in response to the covid pandemic. The FBOP enacted multiphase, national measures to protect staff and inmates from Covid. The FBOP was to implement guidance from the Centers from Disease Control (CDC) and the WHO. The CDC issued guidance for all correctional and detention facilities.[1] This guidance was to "assist in preparing for potential introduction, spread and mitigation of [Covid] in [FBOP] facilities," and has been continuously updated since issuance. The FBOP initiated temporary restrictions on all facilities, which limited visits, transfers, staff training and travel, tours, etc. The guidance intended to implement mandatory screening of staff and inmates. In addition to mandatory screening, there was to be a quarantine period of arriving inmates

[1] See CDC Interim Guidance on Management of Coronavirus Disease 2019 (Covid-19) in Correctional and Detention Facilities (cdc.gov/coronavirus/2019-ncov/ community/correction-detention/guidance-correctional-detention.html

or inmates with symptoms or exposure risk.

A primary facet of the national, multiphase safety measures included social distancing and personal protective equipment (PPE), specifically the issuance of proper masks that staff and inmates were mandated to wear. Inmates received disposable surgical masks in April, 2020; these masks were replaced with washable cloth masks in May, 2020. These cloth masks were manufactured by UNICOR/Federal Prison Industries and distributed to the inmate populations.

At the time of initial distribution, a memorandum was issued by Paul Campbell, The General Manager of Clothing and Textiles Business Group, Federal Prison Industries, Unicor, 400 1st St., NW, Washington, DC 20534. The memorandum stated in pertinent part:

> "[The cloth Unicor masks] are not particulate filtering N95 face masks or considered personal protective equipment(PPE)... Unicor makes no warranty, either express or implied, that this product is effective against biohazards, including contracting **viral** and bacterial illnesses." (Emphasis Added)

In addition, an "Imminent Danger Report" (report) was filed prior by Shane Fausfy, President of Council of Prison Locals 33, 22 Quarry Drive, Watsontown, PA 17777, with the U.S. Department of Labor, Occupational Safety and Health Administration (OSHA) on March 31, 2020. The report alleged that the FBOP was in violation of its various legal duties and "Agenc[y] Responsibilities." The report alleged that the:

> "[FBOP]'s actions described herein are proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities. The [FBOP]'s actions and inactions are expected to result in death and severe health complications and/or possible life-long disabilities."

The report identified the following specific failures (in pertinent part) and identified FCC TH as one of the institutions in violation of the implemented protective measures. Violations such as:

1) Ordering staff to return to work after being exposed to Covid-19 without self-quarantining after a period of only 48 hours;

2) Authorizing the movement of infected inmates, or those suspected of being infected, as well as those who have been in close proximity of the confirmed infected inmates, to areas of the country that do not have any rates of infection, or to institutions otherwise not showing signs of any previous introduction of the virus, thus introducing the virus to the area;

3) Violating CDC guidelines concerning handling existing Covid-19 cases concerning the suspension of all transfers of incarcerated persons to and from facilities unless it is medically necessary, purposes of quarantine, security concerns, or overcrowding;

4) Failure to introduce controls to mitigate or prevent exposure or further exposure to the virus. Engineering controls such as high-efficancy air filters or air scrubbers to minimize the airborne nature of this virus or otherwise improve the ventilation rate in said environments. These violations are alleged to have "resulted in multiple inmates and staff coming in dangerously close contact with each other after potentially being exposed to the virus"; and,

5) Violating OSHA's Personal Protective Equipment (PPE) Standards, 29 CFR Subpart 1.29 et seq. Specifically, the FBOP has failed to provide the proper N-95 masks, or functionally equivalent, to staff (and obviously inmates) who are transportingand have custodial control over hospitalized inmates testing positive for the virus.

The FBOP-wide results of these collective failures are well documented. Such failures are also specifically documented at the facility in which the claimant was housed and that facility is FCCTH.

(11)

Each and every factual allegation listed above is realleged as this claim proceeds against FCCTH in the description of events leading to the injuries the claimant had inflicted upon him.

The claimant had been housed at FCCTH prior to the April 1, 2020 nationally implemented Covid prevention measures. The claimant continues to be housed at the FCCTH facility as of the date of this complaint. During the entire course of the defendant's alleged negligent conduct, the claimant was housed in housing unit A-1.

Transfers of inmates to FCCTH from other institutions continued throughout the period beginning April 1, 2020, and until the date of the filing of this complaint. On April 22, 2020, forty-four (44) new arrivals were transported to FCCTH and placed in Unit B-2(B-2). This is just one documented example of FCCTH violating the CDC guidelines and FBOP multiphase, national measures concerning the temporary restrictions on all facilities limiting prisoner transfers due to potential exposure risks. Transfers to and from FCCTH of potentially infected inmates occurred multiple times.

Inmates were taken to outside medical providers and brought back to FCCTH without being isolated, quarantined, or even screened for possible exposure risks.

Inmates were denied access to CDC-approved PPE, specifically nose and mouth covering masks constructed to eliminate at least 95 percent of viral and/or bacteriological particulate matter, i.e. - Covid.

Staff would frequently violate practices, measures, guidance, and procedures meant to protect both staff and inmates by not wearing masks and/or congregating in large groups and closer than the recommended six feet. These acts exposed the inmate population to increased risks of infection.

(12)

Staff did not adhere to stricter regulations while working in units on the FCCTH compound designated as in "isolation" or "quarantine" status when outbreaks did occur after inmates became infected; such as: not wearing gloves or masks when handling food or mail, when conducting showers and in close proximity to inmates.

These allegations of violations throughout this complaint, but specifically ones such as described in the preceding five paragraphs, were continuously and repeatedly committed. This is not an exhaustive list of all violations of CDC guidance by FCCTH staff.

On or about August 19, 2020, an unidentified inmate was taken to an outside medical treatment provider, returned to A-1, and placed into cell 223, without being isolated, quarantined, or screened for Covid.

On or about August 19, 2020, A-1 was completely placed on "secure-cell status"[1] and all inmates were advised that it was due to a "suspected viral outbreak."

On the morning of August 21, 2020, FCCTH medical staff, namely a nurse identified as Ms. Lubbehusen, performing duties while unaccompanied by any other medical staff, began conducting covid tests[2] on the A-1 inmates. The testing was done in violation of established medical practices and norms. Lubbehusen went inmate to inmate conducting tests without changing gloves, washing or sanitizing her hands, or any other required safety and contamination prevention procedures between each inmate's covid swab test. Additionally, the test swabs were unlabeled and allowed to come in contact with a variety of

---

[1] "Secure Cell Status" is when inmates within a housing unit are locked in their assigned quarters (cell)

[2] "Test" is Nucleic Acid Amplification Test used to detect the presence of Covid-19 RNA

(13)

surfaces; potentially contaminating swabs, disrupting test integrity, and transferring infection from one inmate to another.

Upon conclusion of the August 21, 2020, testing process over 75 A-1 inmates were found to be positive for covid infection. For reasons unknown, a small percentage of the 75 infected inmates were moved from A-1 to another housing unit for purposes of "quarantine." The rest of the A-1 inmates remained in that unit on secure-cell status; including the claimant.

Approximately six days later, on or about August 27, 2020, a second round of covid testing was conducted on the A-1 inmates by two different FCCTH medical staff (unidentified as to their names). During this round of testing, the two nurses wore full ppe, changed gloves and sanitized their hands between each inmate, and did not take any action likely to result in cross-contamination from the test swabs or allow the swabs to contact surfaces unnecessarily. The testing procedures utilized by the FCCTH medical staff during the second round of testing was substantially in greater comportment with medical practice and covid testing standards while being diametric to the lack of adequate procedure on the initial testing of A-1 inmates during the August 21, 2020, testing.

On or about September 2, 2020, the claimant was formally notified that he was covid-positive. The claimant requested copies of the results from the August 21, and August 27, 2020, covid tests on October 22, 2020. FCCTH medical staff employee R. Milburn,H.I.T., provided a response dated 1-18-21(sic)(the response was 11-18-20). The response indicated that the August 27, 2020, test results printout from Quest Diagnostics were available and showing a "Detected" result indicating

(14)

covid positivity. The response further indicated that "[R.Milburn] do[es] not have results for 8/21/20."

On or about September 10, 2020, FCCTH medical staff informed the Unit A-1 inmates, including claimant, that they no longer were covid positive, declaring the inmates "recovered" without further swab testing, blood tests, or medical examinations of any kind.

Immediately proceeding the claimant's covid viral infection, he began experiencing significant respiratory dysfunction. The dysfunction is frequently debilitating and includes: painful lung-function with diminished lung capacity with the claimant being unable to draw a full, deep breath; shallow raspy breathing accompanied by a feeling of hypoxia which is a medical condition wherein the tissues of the body are unable to receive enough oxygen for proper functioning due to a diminished lung capacity. Such lung functioning is still being experienced by the claimant.

On or about December 1, 2020, the claimant followed institutional procedures and presented a medical triage request, or "sick-call" to the FCCTH medical staff, presenting the concerns and symptoms of the lung injuries. Claimant stated to medical staff that he was not, in fact, "recovered." The claimant was reassigned from Unit A-1 to Unit B-2. The claimant was provided with a covid test on December 7, 2020; those test results indicated a "Not Detected" or negative response to covid infection. Unit B-2 was being used as an "isolation" unit. The claimant was not evaluated by medical staff for his complaints identified on the triage request on the date he presented them. Claimant was in B-2 for approximately 21 days total and was never evaluated by medical staff concerning the lung issues complaint. On or about December 21, 2020, claimant was given another covid test, was found

(15)

to be still negative, and reassigned to A-1.

As of the date of the filing of this complaint, no medical evaluation, treatment, or care has been provided by FCCTH medical staff in response to the December, 2020, medical triage request concerning the dysfunctional lung issues. Subsequently diagnosed apnea may be linked.

Relative to these complaints, FCCTH medical staff knew, or had reason to know, that on or about November 13, 2020, the CDC issued its updated list of known short and long-term adverse health effects associated with covid-19. This list included such moderate and serious symptoms and complications as: fatigue, shortness of breath, chest pain, and lung-function abnormalities.

Two additional events were documented and demonstrate the outcome of the types of negligent acts or ommissions alleged herein by the claimant. First, is that during the height of the 2020 covid outbreak, the United States government conducted an historical succession of 17 17 executions. The FCCTH facility is where the executions are conducted. These executions caused FBOP staff, including the execution team members, media witnesses, spiritual advisers, attorneys, and family and friend witnesses to travel from across the country and gather in close proximity for these executions. The executions began on July 14, 2020, and concluded in January, 2021. Between December 16, and December 20, 2020, 33 of the 47 inmates on death row had been infected with covid-19. At least a dozen other persons are known to have tested positive for covid after gathering for executions. These executions qualify as "superspreader events'" based on CDC guidelines.

Second, a federal inmate at a FCCTH institution declared deceased from

---

'A "superspreader event" is just that, an event at which the spread of covid-19 is exaccerbated and effecting a significant quantity of persons

complications of covid-19 after being declared "recovered." Joseph Lee Fultz, 52, was placed in the custody of FCCTH staff at the FCI TH on January 7, 2021. Fultz was tested positive for covid-19 on January 11, 2021, and placed into isolation. On January 25, 2021, Fultz was "converted to a status of recovered" following completion of isolation; dying shortly thereafter.

Staff leave the FCC TH facilities daily. FCCTH staff accompany inmates to outside appointments. However, staff are not required to quarantine, even following events in which the inmate is required to do so. Staff go unit to unit while the unit is on isolation or quarantine status. The acts and ommissions contribute to the spread of covid infections.

These are not an exhaustive list of all know facts, beliefs, or involved staff and staff or inmate witnesses.

## C. Establishing Affirmative Duties

The claimant is able to establish that the defendant, by and through the FBOP and its employees of FCCTH, knew or had reason to know, that affirmative duties existed and were derived from statute, code, regulation, policy, and public health guidance and mandates. These duties were owed to the claimant. A breach of these duties constitutes tortious conduct actionable under federal and state laws when the alleged breaches of duty were the proximate cause of preventable and forseeable injury or injuries. In this action, FCCTH failed to meet an appropriate standard of care specifically during the national covid health emergency as the previous facts demonstrate. The claimant was injured.

As a primary duty 18 USC §4001, 4042 establish the following:

(17)

Section 4042(a) In general, the [F]BOP, under the direction of the Attorney General, shall - (1) have charge of the management and regulation of all Federal penal and correctional institutes; (2)... provide for the safekeeping, care, and subsistence of all persons... convicted...; and, (3) provide for the protection... of all persons... convicted...(cited in pelevant part)

Sections 4001(b)(2) & 4042  also provides that prison officials, including prison physicians, not only have authority, but are charged with responsibility to provide proper care, treatment, and protection of federal prison inmates and have affirmative consitutional duty to provide necessary medical treatment.

Indiana state law also recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health, and, safety of an incarcerated person.

Affirmative duties imposed by section 4042 et seq., and Indiana law, are further delineated by regulations and FBOP institutional policy. The Code of Federal Regulations (CFR) Title 28, Sections 500 et seq., up to and including Section 549 (Medical) as well as FBOP Policy Statements (PS) PS6010.05, PS6013.01, and PS 6190.04 regulate and provide procedural guidance pursuant to §4042 et seq. for the administration of health services, quality improvement of health services, infections disease management, and patient rights and responsibilities.

The FBOP is also subject to guidance, regulation, and management policies derived from the World Health Organization, Centers for Disease Control, National Institute of Health, Occupational Safety and Health Administration, as well as the Indiana Dept. of Public Health.

This is not an exhaustive list of every statute, code, regulation,

(18)

policy, or public health guidance and or mandate that affirms a duty owed to the claimant by the FBOP specifically as it relates to acts or ommissions occurring during the national health emergency arising from the Covid-19 global pandemic and the subsequent and requisite standards of care which are reasonably necessary to protect the health, safety, and well-being of the claimant.

### D. Specific Counts Within Claim
### 1. Rules of Pleading

The initial pleading of a civil action or complaint is governed by Rule 8 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 8 - General Rules of Pleading, Section (9) Claim for Relief states: A pleading that states a claim for relief must contain - (1) a short and plain statement of jurisdiction, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a request for the relief sought. A claim must include enough facts to state a claim for relief that is "plausible on it's face." A claim is facially plausible if the plaintiff pleads enough factual detail to allow the court to draw the inference that the defendant is liable for the alleged misconduct.

### 2. Individual Counts
#### a. Count I
**Negligence Per Se**
**On Behalf of Claimant**
**Against the Defendant**

The Claimant incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding sections of this complaint.

i) The Defendant owed a duty to the claimant to:

(19)

I) ensure that the FCCTH staff provided for the safekeeping, care and protection of the claimant while exercising reasonable care to preserve his life, health, and safety during the ongoing national emergency Covid-19 pandemic;

II) ensure the proper implementation of CDC and other health and medical institutions' guidelines which were to be proactively incorporated within the FBOP's enacted multiphase, national meansures implemented to protect both staff and inmates from covid transmission and infections as well as foreseeable and preventable short- and or long-term adverse health consequences;

III) ensure that the conduct of FCCTH staff provided or facilitated appropriate and effective infections disease mitigation or prevention standards and practices, while preventing FCCTH staff from knowingly, willingly, and intentionally violating or disregarding said standards and practices; &,

IV) provide supervision over the medical staff in the discharging of their duty to adhere to practices and standards when testing inmates for potential covid positivity, implementing isolation or quarantine measures and housing quarters, conducting medical tests or evaluations when determining if or when an inmate previously infected is fit to be declared recovered and to ensure this procedure is properly conducted prior to returning the inmate to general population or original housing assignments.

ii) The Defendant owed this duty to the claimant because:

I) The Defendant knew or should have known that the covid pandemic would create an exceptionally dangerous environment within a penal or correctional institution;

II) The Defendant knew or should have known that section 4042 et seq., and derivative policies and regulations, create an affirmative duty that was particularly relevant to protecting the claimant during the ongoing national health emergency;

III) The Defendant knew or should have known that CDC and other health and medical institutions' guidelines implemented for mitigation and prevention of communicable disease transmission was a minimum standard of care expected to be provided;

IV) The Defendant knew or should have known that FCCTH medical staff are to be specifically trained and knowledgable of appropriate methods of testing inmates for covid positivity including the need to don PPE (including medically acceptable gloves, gowns, face masks, etc.), avoiding cross contamination between inmates being tested, securing swabs for proper analyzation and accurate attribution of any results

(20)

to the correct inmate from whom the swab was taken, over-seeing and supervising the isolation and or quarantine units and protocols, and ensuring adherence to medical guidelines used when evaluating or determining the status of whether a previously infected inmate is fit to, or appropriate for, being declared recovered;

V) The Defendant knew or should have known that it assumed responsibility for ensuring proper training and supervision of FCCTH staff when implementing the national preventative and mitigation measures imposed by the FBOP as well as adherence to said measures; and,

VI) The Defendant knew or should have known that it was best situated to prevent the harms resulting from any deviation from, or failures to follow, the imposed national preventative measures at FCCTH.

iii) The Defendant breached its duty to the claimant by:

I) Continuing to transfer inmates to and from FCCTH from other institutions despite the national prohibition on transfers;

II) Continuing to allow inmates to travel to outside medical providers when not medically necessary and then returning the inmate to the general population without isolation or quarantine;

III) Allowing FCCTH staff to refuse to submit to contact tracing or covid testing at any time it might be reasonable to believe that potential exposure to contamination had occurred;

IV) Failing to provide engineering controls to minimize the airborne nature of the covid virus or improve the ventilation in the inmates' housing units;

V) Allowing FCCTH staff to fail to wear ppe at all times, including wearing masks when interacting with inmates in close proximity, and failing to require staff to adhere to social distancing mandates;

VI) Failing to provide appropriate N-95, or equivalent, face masks to ensure minimization of likely transmission of covid particulates;

VII) Allowing FCCTH staff to travel unimpeded between housing units, especially when going from known isolated or quarantined units to those with no known active infections;

VIII) Failing to adhere to CDC guidelines in all of these matters as listed; and,

IX) Failing to train and supervise FCCTH staff in what is reasonable conduct under the mitigation controls implemented

(21)

at all FBOP facilities.

As a direct result of the Defendant's unlawful conduct, the claimant has endured foreseeable pain and suffering, mental and emotional distress, and associated damages.

### b. Count II
Negligence
on Behalf of Claimant
Against the Defendant

The Claimant incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding sections of this complaint.

i) The Defendant owed a duty to the claimant to:

I) Implement CDC guidance intended to mitigate and prevent likely transmission of covid while minimizing unnecessary exposure risks;

II) Adhere to minimum standards of care when managing the covid pandemic within the FCCTH institution;

III) Ensure that FCCTH staff did not knowingly create unnecessary exposure risks to inmates in their care, custody, and control; and,

IV) Preserve and protect the health and welfare of the claimant who is reliant upon FCCTH staff to secure such protections;

ii) The Defendant owed this duty to claimant because:

I) The Defendant knew or should have known that FCCTH staff were required to implement CDC guidance in accordance with their duty to discharge the obligations imposed by the FBOP's national preventative measures;

II) The Defendant knew or should have known that the implementation of CDC guidance was reasonably necessary to provide a minimum standard of care pursuant to state and federal law;

III) The Defendant knew or should have known that fCCTH staff are obligated to follow all aspects of the national prevention measures as the measures are necessary to protect the staff and inmates from forseeable and preventable injuries;

(22)

IV) The Defendant assumed responsibility to train and super-vise FCCTH staff in regards to implementing national pre-ventative measures and ensuring adherence to this minimum standard of care; and,

V) The Defendant was best situated to prevent the harms re-sulting from any deviation from, or failures to follow, the imposed national preventative measures at FCCTH.

iii) The Defendant breached its duty to the Claimant by:

I) Continuing to transfer inmates to FCCTH from outside insti-tutions in contradiction of a proscription against unnec-essary transfers;

II) Allowing FCCTH to become a quarantine site for outside inmates;

III) Allowing FCCTH inmates to travel to outside medical pro-viders and return without being tested, isolated, or quar-antined;

IV) Allowing unnecessary staff travel that by its very nature increased potential exposure risk;

V) Allowing staff to not wear face masks, or other PPE as situations within FCCTH dictated, as well as violating social distancing practices;

VI) Failing to provide adequate PPE, specifically medically adequate face masks designed to prevent virological part-iculate transfer between inmates and staff;

VII) Allowing staff to refuse to submit to covid testing, contact tracing, or other similar preventative measures while ent-ering or exiting the FCCTH institution;

VIII) Allowing staff to increase exposure risk to covid negative inmates by rotating staff between covid positive, or iso-lation and quarantine units, to units that were not presen-ting symptoms of active infection or under quarantine pro-tocols.

As a direct result of the Defendant's unlawful conduct, the Claim-ant has endured foreseeable pain and suffering, mental and emotional distress, associated damages.

(23)

## C. Count III
### Negligence
### On Behalf of Claimant
### Against the Defendant

The claimant incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding sections.

i) The Defendant owed a duty to the Claimant to:

I) Provide adequate and competent medical care in a timely manner;

II) Provide adequate and competant medical care with the intention of preserving and protecting the health, safety and welfare of the Claimant;

III) Not engage in conduct that might reasonably be expected to increase the risk to the claimant of contracting a contagious disease and endangering his short- and long-term health;

IV) Provide medical care that comports with reasonable standards of care based on the national measures implemented by the FBOP to prevent and mitigate the transmission of covid-19 amongst the inmate populations.

ii) The Defendant owed a duty to the Claimant because:

I) The Defendant knew or should have known that FCCTH medical staff are required to provide adequate and competent medical care with the intention of preserving and protecting the health, safety, and welfare of the Claimant in a timely manner pursuant to the U.S. Constitution, State and federal law, and applicable regulations and polocies;

II) The Defendant knew or should have known that the CDC guidelines are necessary to reasonably protect the Claimant from unecessary and foreseeable injury from covid infections;

III) The Defendant knew or should have known that the Claimant has a right to such medical care;

IV) The Defendant assumed responsibility for the training and supervision of FCCTH medical staff regarding adequate, competant, and timely medical care in comportment with national measures implemented to protect the claimant and prevent exposure to, and transmission of, covid-19.

(24)

iii) The Defendant breached its duty to the Claimant by:

I) Scheduling and authorizing unnecessary or otherwise, medical trips to outside healthcare providers requiring inmates to risk exposure to covid-19 thereby increasing the likelihood of infecting inmates at FCCTH;

II) Not isolating or quarantining inmates returning from outside medical trips that reasonably could be expected to have been exposed to covid virus and placing them immediately in general population;

III) Failing to regulate the movement of other FCCTH staff outside the medical department as they entered and exited isolation and quarantine units while performing their duties and then immediately entering and exiting other infection free units, or would move from the Penitentiary to the Medium to the Camp areas of the FCCTH facility and then back again significantly increasing the likelihood of exposure to, and transmission of, the covid virus within the inmate populations;

IV) Failing to adhere to proper procedures when conducting covid testing of the inmate population increasing the likelihood of cross-contamination and infection of the inmate population when virus swabs are mishandled;

V) Failing to provide timely medical evaluations when the Claimant presented a proper sick call or triage request to FCCTH medical staff;

VI) Placing the Claimant, who has placed a sick call or triage request, into an isolation or quarantine unit despite the fact that the inmate is not presenting symptoms demonstrating contemporaneous viral infection, has produced a contemporaneous negative covid test, and is presenting symptoms of adverse health effects from a previous, known covid infection where the Claimant is recklessly exposed to other inmates with active covid infections;

VII) Leaving the Claimant in the isolation or quarantine unit for approximately 21 days without treating him prior to placement and not providing follow-up medical evaluation, examination, or treatment in what is reasonably viewed as nothing less than a hostile environment intended to discourage requests for medical treatment;

VIII) Declaring the Claimant recovered without a medical examination; and,

IX) Failing to train and supervise FCCTH medical staff to ensure that safe and effective medical care is being provided in comportment with the national FBOP mitigation

(25)

measures during the covid national emergency.

As a direct result of the Defendant's unlawful conduct, the Claimant has endured foreseeable pain and suffering, mental and emotional distress, and associated damages.

## VIII. DAMAGES

The Claimant is requesting compensatory damages in the amount of $2,500,000.00 (Two-Million, Five-hundred Thousand dollars and zero cents in U.S. FederalReserve Note (Dollars)).

This amount was calculated by considering that the Claimant was inflicted with the preventable contraction of covid-19, the short- and long-term adverse health effects, namely injury of the lungs as described herein, diminishment in quality of life, interference with an ability to earn an income due to physical disability, mental and emotional distress, and likely medical expenses related to the treatment of the Claimant's physical injury.

## IX. UNSWORN DECLARATION - 28 U.S.C. §1746

I, Roy Edward Ates, Jr., the Claimant in this action, do hereby certify and declare that all of the factual allegations, and assertions of indigency, are true and correct to the best of my knowledge under full penalty of perjury as allowed by applicable law.

## X. REQUESTED RELIEF

1) Enter Judgement in favor of Claimant/Plaintiffs against the Defendant on each of the Counts stated above;

2) Award reasonable and just compensatory damages to the Claimant/ Plaintiff for the injuries suffered;

(26)

3) Any other reasonable and just relief that this Court determines
   to be proper in accordance with this complaint and request.

Respectfully submitted this 3RD day of November_____, 2021.


                                    Respectfully,


                                    _____
                                    Roy Edward Ates, Jr.
                                    Claimant/Plaintiff, pro se
                                    Reg. #88532-380
                                    USP Terre Haute
                                    PO Box 33
                                    Terre Haute, IN 47808