UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

ROY EDWARD ATES, JR.,              )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        No. 2:21-cv-00418-JPH-MG
                                   )
UNITED STATES OF AMERICA,          )
                                   )
            Defendant.             )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Roy Edward Ates, Jr., is a federal prisoner. He alleges that prison officials' negligence caused him to become infected with COVID and that prison personnel were negligent in providing him medical treatment thereafter. Defendant, the United States, has moved for summary judgment. Dkt. [130]. For the reasons below, that motion is **GRANTED**.

**I.**
**Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility

1

determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Background

### A. Factual Background

Because Defendant has moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Ates and draws all reasonable inferences in his favor. *Khungar,* 985 F.3d at 572–73.

From July 1, 2020 to October 22, 2020, Mr. Ates was housed in the A1 unit of the United States Penitentiary – Terre Haute (USP) within the Federal Correctional Complex - Terre Haute (FCC). Dkt. 130-6 ¶ 4; dkt. 130-50.

In January 2020, the Bureau of Prisons (BOP) issued its first memorandum and recommendations about COVID, dkt. 130-8, which was followed by additional recommendations, memoranda, and bulletins. Dkts. 130-9 to 130-26 (various BOP memoranda regarding COVID from February 29 through August 31, 2020). BOP guidance regarding COVID was drafted based upon public policy considerations of safety, security, health (physical and mental) of inmates and staff, facility population capacities, availability of medical equipment and supplies, and evolving scientific and medical data. Dkt. 130-2 at ¶ 7. The recommendations and guidance were not formally adopted as rules or regulations so that each BOP facility had discretion to implement the guidance based on the unique needs and conditions in them. *Id.* at ¶ 8.

On August 18, 2020, a USP A1 unit inmate known as "Baltimore" was taken to a medical appointment outside FCC – USP. Dkt. 144-4 at 2. Mr. Ates believes that proper protocols were not followed regarding screening, testing, or isolating "Baltimore" before and/or after this appointment. *Id.*; dkt. 143 at 9-10.

On August 19, "Baltimore" tested positive for COVID. Dkt. 130-1 at 51. On that day, Mr. Ates was working in the USP laundry, where the staff and inmates did not wear masks because of the heat in the facility. Dkt. 144-4 at ¶ 5. When staff learned of "Baltimore"'s positive test, Mr. Ates and all other A1 unit inmates

3

were taken from the laundry to their cells but were not immediately tested for COVID. *Id.* at 3 ¶ 11. The A1 unit also was placed on lockdown at that time and was designated as a COVID isolation unit. Dkt. 130-27 at ¶ 16.

On August 21 or 22, Mr. Ates began experiencing symptoms consistent with a COVID infection, including body aches, fever, diarrhea, vomiting, headaches, chills, coughing, sore throat, runny nose, and a loss of taste and smell. Dkt. 144-1 at 63-65. For the next several days, USP staff came by the cells in A1 unit and took inmates' temperatures and sometimes asked about symptoms but did not provide any other treatment or medication to inmates. *Id.* at 69.

On August 27, 2020, Mr. Ates and the other inmates in the A1 unit were tested for COVID and 34 of 76 inmates tested positive. Dkt. 130-27 at ¶¶ 14-15; dkt. 130-33.

On September 9, 2020, Mr. Ates was seen by Nurse Practitioner Casey Frank. Dkt. 130-34. The medical record indicates that he had been symptom free for approximately 10 days at that point and that his COVID illness was resolved. *Id.*

Mr. Ates states that ever since his COVID infection, he has had trouble breathing and engaging in athletic activities. Dkt. 144-1 at 103, 115.

On October 30, 2020, Dr. L. Rogatnick evaluated Mr. Ates based on a complaint of sleep apnea. Dkt. 130-35. At this visit, Dr. Rogatnick noted that Mr. Ates's pulmonary function was "within normal limits," that his oxygenation

was 95%, and respirations were 16 per minute. *Id.* Dr. Rogatnick ordered a sleep study for Mr. Ates. *Id.*

On December 7, 2020, Mr. Ates was seen by Nurse K. Lubbehusen to evaluate his complaints of a cough and cold or flu symptoms. Dkt. 130-36. His oxygenation was 98%. *Id.* A COVID test from this date was negative. Dkt. 130-37. After consultation with NP Frank, a chest x-ray was ordered for Mr. Ates, which was taken on December 8. Dkt. 130-38. Dr. William Wilson and a radiologist evaluated the x-ray and found, "[n]o acute cardiopulmonary disease. Lungs are clear." Dkt. 130-3 at ¶ 31. Dr. Wilson found no need for follow-up care after reviewing the x-ray. *Id.* After his visit with Nurse Lubbenhusen, Mr. Ates was placed in a quarantine unit at USP until December 31, 2020, and was moved back to his normal cell after a second COVID test also came back negative. Dkt. 130-1 at 90; dkt. 130-6 at 2.

Mr. Ates's sleep study was conducted on May 25-27, 2021. Dkt. 130-43. Mr. Ates was diagnosed with severe obstructive sleep apnea. *Id.* at 2. Afterwards, Mr. Ates was issued a CPAP machine. Dkt. 130-44.

On October 3, 2023, Dr. Wilson examined Mr. Ates during a chronic care visit. The medical record states in part, "he works vigorously with the maintenance department here and also in the snow crew. Currently he is working in electrical work and busting concrete. He is able to do that with no problems . . . ." Dkt. 130-46 at 1. His respirations were 14 per minute and his oxygenation was 97%. Dr. Wilson's chest exam revealed "equal expansion, clear

to auscultation bilaterally. No rhonchi, no crackles, normal breath sounds." *Id.* at 3. Dr. Wilson did order a follow-up chest x-ray, which was conducted on November 9, 2023. Dkt. 130-48. No abnormalities were noted and the overall impression was "[s]table/normal chest examination." *Id.*

Three days earlier, on November 6, Mr. Ates was seen by nurse A. Murphree, complaining of shortness of breath. Dkt. 130-47. His respirations were 20 per minute and his oxygenation was 100%. *Id.* Nurse Murphree noted that Mr. Ates's lung sounds were "clear throughout." *Id.* Nurse Murphree also conducted an EKG, which was normal. *Id.* Mr. Ates was not prescribed any treatment and was told to "Follow-up at Sick Call as Needed." *Id.*

The last medical visit in the record is from March 19, 2024, when Mr. Ates saw NP Frank. Dkt. 130-49. NP Frank's notes of Mr. Ates's pulmonary system state, "Inspection WNL with normal thoracic expansion, normal diaphragmatic excursion, Clear to auscultation without crackles, rhonchi, wheezing, or pleural rub." *Id.* at 2. No cough was noted. *Id.* Mr. Ates stated he was continuing to use his CPAP machine. *Id.* at 1.

Mr. Ates testified during his deposition that December 7, 2020, and November 6, 2023, were the only two times he specifically sought medical care for difficulty breathing. Dkt. 130-1 at 94. There were, however, other occasions when he complained about difficulty breathing. Dkt. 144-4 at ¶ 19; Dkt. 130-1 at 177.

Defendant retained Dr. Alysse Wurcel as an expert witness. She is a physician licensed in Massachusetts to practice as an internal medicine and infectious disease specialist. Dkt. 130-5 at p. 1 ¶ 1. She has worked in Massachusetts jails as an infectious disease specialist since 2013. *Id.* at p. 1. ¶ 2. She has published over 100 articles in peer-reviewed publications, including articles on COVID. *Id.* She also assisted Massachusetts sheriffs in their response to COVID beginning in March 2020. *Id.* at p. 3.

Dr. Wurcel examined the discovery materials in this case and signed a sworn declaration that concluded:

> In summary, I think it is highly unlikely that the plaintiff can tell who infected him with COVID-19. It is highly unlikely [Baltimore] was the cause of the COVID-19 cluster in August 2020. Mr. Ates does not have lung damage. And the diagnosis of obstructive sleep apnea is highly unlikely to be related to his minimally symptomatic August 2020 COVID-19 infection.
>
> Based on what I have reviewed, the BOP provided evidence-based, guideline-concordant medical care to plantiff [sic] in August 2020 and December 2020.

Dkt. 130-5 at p. 6. Although Dr. Wurcel wrote this report before receiving Mr. Ates's medical records from after August 2023, she subsequently declared that "[n]othing in these materials causes me to change the opinions and conclusions I stated in my expert report." *Id.* at p. 2 ¶ 4.

During Dr. Wurcel's deposition, counsel for Mr. Ates asked Dr. Wurcel about a study finding an association between sleep apnea and long COVID. Dkt. 144-2 at 150. Dr. Wurcel testified that she was not aware of that study and could

not give an opinion about it without having reviewed research methods and study design. *Id.* at 152. Ultimately, she reaffirmed her opinion that there was not a link between sleep apnea and long COVID. "And if they are related, it's confounded by several other issues. I mean, just – he has a BMI of 39. That's more predictive of obstructive sleep apnea than anything." *Id.* at 154.

### B. Procedural Background

Mr. Ates filed his complaint against Defendant on November 8, 2021, under the Federal Tort Claims Act ("FTCA"). Dkt. 1. Count 1 alleges that USP staff were negligent *per se* because they didn't adhere to COVID protocols and guidelines from the Centers for Disease Control and other organizations, related to prevention and mitigation of transmission of the disease. *Id.* at 19. Count 2 alleges ordinary negligence for essentially the same reasons. *Id.* at 22. Count 3 alleges a violation of Defendant's duty to provide adequate medical care to inmates. *Id.* at 24. Count 3 itself does not specify when the alleged inadequate medical care was provided, but the "Facts" portion of the complaint states, "[a]s of the date of the filing of this complaint, no medical evaluation, treatment, or care has been provided by FCCTH medical staff in response to the December, 2020, medical triage request concerning the dysfunctional lung issues." *Id.* at 16. The Court screened the complaint on May 3, 2022, finding that it stated negligence claims under the FTCA based on allegation "that officials at USP Terre Haute failed to protect him against the virus and failed to treat him after he contracted the virus . . . ." Dkt. 18 at 2.

Defendant moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 33.

The Court granted the motion to dismiss as to Count 1 of the complaint, negligence per se. Dkt. 43 at 18. The Court denied dismissal as to Counts 2 and 3, holding that Counts 2 and 3 could only proceed under a theory of gross negligence. *Id.* at 19. The Court further limited the scope of those claims, finding that Count 2 was limited to Mr. Ates's claim that he contracted COVID as a result of the BOP's gross negligence when it did not screen or isolate an inmate named "Baltimore" upon his return from an appointment with an outside medical provider. Also, the Court stated that Count 3 of the complaint allowed a

> reasonable inference that USP Terre Haute staff knew of the health dangers associated with COVID-19 infections (including lung problems), knew that Mr. Ates had tested positive for COVID-19, and knew that he was complaining of symptoms consistent with a COVID-19 infection, yet failed to provide him with any treatment or evaluation beyond giving him a COVID-19 test an isolating him for 21 days.

*Id.* at 9.

After counsel was recruited for Mr. Ates, Defendant moved for summary judgment. Dkt. 130.

### III.
### Discussion

**A. Applicable Law**

Mr. Ates alleges that the United States was negligent in preventing him from being exposed to COVID and failing to provide him with adequate treatment

for medical conditions caused by COVID infection.  Because this case is proceeding under the FTCA, Indiana substantive law applies. 28 U.S.C. § 1346(b)(1); *see also 28 Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred[.]"). Under Indiana law, "[t]he tort of negligence consists of three elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach." *Martin v. Ramos*, 120 N.E.2d 244, 249 (Ind. Ct. App. 2019).

Indiana's COVID-19 immunity statute, however, provides that "a person is immune from civil tort liability for damages arising from COVID-19: (1) on the premises owned or operated by the person; (2) on any premises on which the person or an employee or agent of the person provided property or services to another person; or (3) during an activity managed, organized, or sponsored by the person." Ind. Code § 34-30-32-6. "Arising from COVID-19" means alleged injuries arising from either "(1) the actual, alleged, or possible exposure to or contraction of COVID-19; or (2) services, treatment, or other actions performed for COVID-19." Ind. Code § 34-30-32-2.  Immunity does not apply "to a person whose actions or omissions constitute gross negligence or willful or wanton misconduct (including fraud and intentionally tortious acts) as proven by clear and convincing evidence." Ind. Code § 34-30-32-7.

Thus, the United States's liability in this case for damages arising on its property from COVID-19 is limited to circumstances where its conduct constituted gross negligence or willful or wanton misconduct—just as it would be if the United States were a private owner or operator of its premises. *See* 28 U.S.C. § 1346(b)(1); Ind. Code §§ 34-30-32-6, 34-30-32-7. To constitute gross negligence, a plaintiff must prove that the defendant consciously breached a duty owed with a reckless disregard of the consequences to another. *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465-466 (Ind. 2003) (defining gross negligence as "'[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party.'"  In other words, it is an "intentional failure to perform a duty in reckless disregard of the consequences." *McGowen v. Montes*, 152 N.E.3d 654, 661 (Ind. Ct. App. 2020). Whether an act or omission constitutes gross negligence generally is a question of fact, but it may become a question of law if the facts are undisputed and susceptible to only one interpretation. *Id.*

### B. Count 2 – Mr. Ates's Contracting COVID

In Count 2 of the Complaint, Mr. Ates alleges that he became infected with COVID because the BOP failed to take reasonable steps to mitigate the risk of Mr. Ates and other inmates being exposed to COVID.  The United States argues that it is entitled to summary judgment on Count 2 because Mr. Ates has not designated evidence from which a jury could reasonably find that any conduct of the BOP was a conscious, voluntary act or omission in reckless disregard of

Mr. Ates's health and welfare. The United States further argues that Mr. Ates also has not designated evidence from which a jury could reasonably find causation, that is, a causal link between the BOP's conduct and Mr. Ates contracting COVID-19.

### 1. Breach

The United States argues that it is entitled to summary judgment because Mr. Ates cannot meet the high standard of showing by clear and convincing evidence that the BOP engaged in a conscious, voluntary act or omission in reckless disregard of the consequences to Mr. Ates. Dkt. 131 at 19–21. Mr. Ates responds that the BOP breached a duty owed to Mr. Ates when it allowed inmate "Baltimore" to return from an outside medical appointment to the A-1 cellblock without first being tested for COVID, and by returning Mr. Ates to the A-1 cellblock without testing him and other inmates, which would have enabled the BOP to isolate inmates who were positive and keep them separate from inmates who were not known to have COVID. Dkt. 143 at 8–13.

To show gross negligence, Mr. Ates must show that there was an intentional breach by the BOP, that is, an intentional failure to perform a duty in reckless disregard of the consequences. *York v. Fredrick*, 947 N.E.2d 969, 978 (Ind. Ct. App. 2011). And the intentional breach must be shown by "clear and convincing evidence." Ind. Code § 34-30-32-7. Here, the designated evidence shows that inmate Baltimore went to an outside medical appointment on August 18, 2020, was returned to the A-1 cellblock that same day. The next day, BOP

staff learned that he tested positive for COVID and put him in quarantine, away from the other inmates. Mr. Ates has not designated evidence showing that BOP officials knew or should have known that inmate Baltimore had close contact with someone who had COVID while he was at his outside medical appointment, or that he had COVID symptoms when he returned from that appointment. Nor has Mr. Ates designated evidence that he was placed in a cell with an inmate who BOP knew to be infected with COVID when Mr. Ates did not have COVID. In short, Mr. Ates has not designated evidence from which a jury could find by clear and convincing evidence that BOP personnel intentionally failed to perform a duty in reckless disregard of the consequences by allowing inmate Baltimore to return to cellblock A-1 after his outside appointment and thereafter returning Mr. Ates to cellblock A-1.

As to Mr. Ates' argument that sending him from the laundry back to cellblock A-1 on August 19, 2020, without first testing him and other inmates constituted gross negligence, the designated evidence shows that this was consistent with applicable BOP policies and procedures designed to mitigate the spread of COVID infection. Dkt. 130-2 at 13-15; dkt. 130-04 at 2-3. Mr. Ates' argument that BOP employees engaged in "careless, lazy, and inattentive behavior" does not show by clear and convincing evidence that the BOP engaged in a conscious, voluntary act or omission in reckless disregard of the consequences to Mr. Ates. Finally, Mr. Ates designates no admissible evidence

in support of his contention that he shared a ventilation system with inmates who had tested positive for COVID when he was returned to the A-1 cell block.

Even assuming that the BOP could have done more or acted differently with rapid COVID tests or alternative quarantine or cohort arrangements, that is not enough to meet the heightened breach standard. In sum, Mr. Ates has not designated evidence from which a reasonable could conclude that BOP personnel engaged in a conscious, voluntary act or omission in reckless disregard of the consequences to Mr. Ates. *York*, 947 N.E.2d at 978.

### 2. Causation

The United States argues that it is entitled to summary judgment because Mr. Ates has not designated evidence from which a jury could reasonably find causation, that is, a causal link between the BOP's conduct and Mr. Ates contracting COVID-19. Mr. Ates contends that causation was established by the fact that he was brought to the A-1 cell block "without testing, separating inmates, or quarantining anyone." Dkt. 143 at 12-13. Mr. Ates further argues that he does not need a medical expert to establish causation because his COVID-19 positive test established that he had contracted COVID-19. *Id.* at 12-13.

"To prove causation, a plaintiff must present specific facts that would demonstrate that defendant's allegedly negligent behavior caused the plaintiff's injuries." *Gearnhardt v. United States*, No. 2:17cv186-JRS-DLP, 2018 WL 5923923, at *5 (S.D. Ind. Nov. 13, 2018). Here, Mr. Ates has not designated

evidence allowing a reasonable jury to make that finding.  First, the designated evidence shows that Mr. Ates does not know how or when he became infected with COVID-19, dkt. 130-1 at 62-63 (Ates Dep. at 61:7-62:20), so he cannot connect the COVID infection he experienced in August 2020 with the BOP's allegedly negligent behavior—allowing inmate Baltimore back into cellblock A-1 without first testing him and then returning Mr. Ates to cellblock A-1 without first "testing, separating inmates, or quarantining anyone," dkt. 143 at 12. Although he testified that he is "pretty sure" he contracted COVID-19 from inmate "Baltimore" or from being returned to A-1 cell block on August 19, dkt. 130-1 at 62-63 (Ates Dep. at 61:7-23); dkt. 144-4 at 3 ¶¶ 10-12, that belief is speculative.

The designated evidence shows that on the evening of August 21, 2020, or the morning of August 22, 2020, Mr. Ates began experiencing symptoms consistent with COVID-19 infection. [Dkt. No. 130-1 at 63-66 (Ates Dep. at 62:21-65:8).].  His symptoms lasted 5-6 days and he tested positive for COVID-19 on August 27, 2020.  *Id.* at 66, 172 (Ates Dep. at 65:9-17, 171:15-16); 170-171 (Ates Dep. at 169:23-170:3); Dkt. 130-3 at 8 (Wilson Decl. ¶ 26); Dkt. 130-33 at 1 (Ex. 27 at 1).  Mr. Ates has not designated evidence that he did not have COVID-19 on August 18-19 before he was in close contact with inmate Baltimore and returned to the A-1 cell block. Dkt. 144-4 at 3 ¶ 13 ("Once the A-1 housing unit was locked down, testing of the A-1 inmates did not begin until August 21, 2020."); dkt. 143 at 9 ("Mr. Ates should have been tested at the laundry where

he was working . . . prior to being taken back to A-1 block."). Given that the incubation period for COVID-19 is up to 14 days, dkt. 130-19, Mr. Ates could have contracted COVID-19 anytime within up to two weeks before August 21 or 22 when he first began experiencing symptoms.  During those two weeks, Mr. Ates came into contact with numerous individuals, any one of whom could have been the source of his COVID-19, including the other inmates who he regularly worked alongside in the laundry in close quarters, and who often didn't wear masks.  Dkt. 149-1 at 1-2 ¶¶ 3-5.  So, there are many different sources from which Mr. Ates could have contracted COVID within a broad timeframe, and no designated evidence from which a jury could find that Mr. Ates became infected as a result of the United States' actions during the two days in August 2020 that underpin his claim. *See* dkt. 143 at 3–4, 8–9.

Against these facts, Mr. Ates has not designated evidence from which a jury could find that he became infected with COVID-19 from being in close contact with inmate "Baltimore" and returned to the A-1 cell block on August 19. So, he cannot show that he contracted COVID on August 18 or 19 as a result of the BOP not testing inmate "Baltimore" before and after his outside medical appointment or from the BOP putting numerous inmates in the A-1 block without testing, separating inmates, or quarantining anyone.  Dkt. 143 at 10-12.

Mr. Ates also has not designated expert witness testimony from which a jury could reasonably find causation.  *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639,

643 (7th Cir. 2010) ("But when there is no obvious origin to an injury and it has 'multiple potential etiologies, expert testimony is necessary to establish causation.'").  While expert testimony is one way to show causation, a plaintiff can also show causation using circumstantial evidence.  Whatever method of proof is used, however, the plaintiff must present evidence from which a jury could reasonably find that the COVID infection was caused by the defendant's breach of the duty of care. *Byrd v. Munoz*, No. 24-1618, 2025 WL 943408 at *2 (7th Cir. Mar. 28, 2025) (unpublished); *Gearnhardt*, 2018 WL 5923923 at *5; *Brown v. Lehman*, No. 21-CV-625, 2024 WL 1554100, at *5 (W.D. Wis. Apr. 10, 2024) (granting summary judgment to defendants in Eighth Amendment deliberate indifference case where plaintiff-inmate only presented his own speculation that he must have caught COVID from two positive-tested inmates who were allowed to return to plaintiff's unit).   Here, Mr. Ates designates no such evidence, so it would be speculative to conclude that he contracted COVID from Baltimore or as a result of being placed on lockdown in the A-1 unit.

Mr. Ates has not designated evidence from which a jury could conclude when or how he contracted COVID-19.  In the absence of such evidence, no reasonable jury could conclude that Mr. Ates got COVID-19 as a result of the BOP's actions. *See Byrd*, No. 24-1618, 2025 WL 943408 at *2 ("Yet nothing in the record identifies how Byrd contracted COVID-19; absent is the causal link between the defendants' conduct of improperly wearing masks and Byrd's COVID-19 infection."); *see also Gearnhardt*, 2018 WL 5923923, at *5 ("To prove

causation, a plaintiff must present specific facts that would demonstrate that defendant's allegedly negligent behavior caused the plaintiff's injuries."). Similarly, a jury could not find causation from the mere fact that Mr. Ates became infected with COVID-19 while living in the FCC-TH. *See Byrd* at *2; *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993) ("[C]ausation may not be inferred merely from the existence of an allegedly negligent condition.").

In sum, Mr. Ates has not designated evidence from which a jury could reasonably find that the BOP's protocols, or any alleged failure to follow them, *caused* Mr. Ates to contract COVID. So, even if Mr. Ates could show breach, Defendant is entitled to judgment as a matter of law with respect to Count 2 of the complaint.

### C. Count 3 of the Complaint – Mr. Ates's Medical Care After Contracting COVID

In Count 3 of the Complaint, Mr. Ates alleges that the BOP failed to provide him with adequate medical care to treat conditions caused by COVID. There are two timeframes at issue: (1) late August 2020 when Mr. Ates experienced COVID symptoms; and (2) starting in December 2020 when Mr. Ates began experiencing what he describes as lung dysfunction.

#### 1. August 2020

Defendant argues that Mr. Ates is barred from pursuing any claim based on the BOP's treatment of his COVID symptoms in August 2020. The Court's screening order stated that FTCA claims were proceeding on the negligence

18

theory "that officials at USP Terre Haute . . . failed to treat him after he contracted the virus . . . ." Dkt. 18 at 2. Defendant does not cite any part of the record showing that the Court or Mr. Ates limited Count 3 to medical treatment he received from December 2020 forward. Moreover, the Court did not effectively dismiss this claim in its partial order of dismissal on February 2, 2023, as Defendant argues.  In declining to dismiss Count 3 of the Complaint, the Court stated that Count 3's allegations supported "a reasonable inference that USP Terre Haute staff . . . knew that Mr. Ates had tested positive for COVID-19, and knew that he was complaining of symptoms consistent with a COVID-19 infection, yet failed to provide him with any treatment or evaluation beyond giving him a COVID-19 test and isolating him for 21 days." Dkt. 43 at 8-9. Therefore, the Court proceeds to evaluate on the merits whether the United States is entitled to summary judgment on Mr. Ates's claims related to treatment in August 2020.

During that timeframe, Mr. Ates had severe COVID symptoms for approximately five to six days, during which nurses performed daily temperature checks and inquired about symptoms but provided no other treatment. Dkt. 130-1 at 63, 66-67.  The nurses told Mr. Ates and other inmates that they could get over-the-counter medication from the commissary, but guards told the inmates that commissary was unavailable because their unit was on lockdown. *Id.* at 67. By the time Mr. Ates had a follow-up nursing check on September 9, he reported that he had been symptom-free for approximately 10 days. Dkt. 130-34 at 1.

19

To establish gross negligence, Mr. Ates must show "'[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party.'" *N. Ind. Pub. Serv. Co.*, 790 N.E.2d at 465-466. Here, the record shows that Mr. Ates had a typical bout with COVID, experiencing symptoms that included body aches, fever, diarrhea, vomiting, and headaches, and recovered from it quickly. "Millions of people in the United States have suffered from these same symptoms. Most did not receive medical treatment; instead, like [Mr. Ates], they rested at home and allowed their bodies to fight the infection." *Stevens v. Carr*, 2021 WL 39542, at *6 (E.D. Wis. Jan. 5, 2021) (citing *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (dismissing Eighth Amendment deliberate indifference claim at screening that was based on allegation defendants failed to provide any treatment at all for COVID symptoms like Mr. Ates's, because symptoms did not amount to objectively serious medical need).

Here, Mr. Ates has not designated evidence that he had symptoms showing that he was at high risk for hospitalization or other severe COVID complications, and does not otherwise explain how the BOP's decision to monitor him without providing other treatment was "in reckless disregard of . . . the consequences to [him]." *N. Ind. Pub. Serv. Co.*, 790 N.E.2d at 465-466. While Mr. Ates had "to handle his symptoms with no treatment", dkt. 143 at 13, he cites no authority showing that there was a course of treatment the BOP should have followed other than doing what it did—daily temperature checks and monitoring for severe

complications that would require hospitalization. Still, Mr. Ates contends that the BOP should have done something else to treat him.

While the caselaw applying Indiana's COVID immunity statute is sparse, *Fluhr v. Anonymous Dr. 1*, 234 N.E.3d 912, 920 (Ind. Ct. App. 2024), provides an example of the standard of care applied during COVID under the immunity statute. There, the Indiana Court of Appeals discussed the application of the COVID-19 immunity statute to a claim of medical negligence. The court found that the defendants' misdiagnosis of a patient suffering a stroke with COVID-19, the ensuing delay in full examination and treatment as the patient was isolated pending COVID-19 test results, and the patient's death caused by that stroke did not constitute gross negligence under Indiana Code § 34-30-32-2. *Id.* at 915-20. The Court concluded that "[t]he only reasonable conclusion reached from the designated evidence is that [the decedent] received care in-line with that expected during an uncertain time—April 2020—while the world grappled with a global pandemic." *Id.* at 919. Applying *Fluhr* here, the relatively minimal care provided to Mr. Ates during his bout with COVID—temperature checks and monitoring for symptoms that would suggest more serious complications—sufficed. That conclusion is bolstered by Dr. Wurcel's opinion that the treatment Mr. Ates received during this timeframe was "evidence-based, guideline-concordant medical care." Dkt. 130-5 at 6. Mr. Ates offers no expert opinion or legal authority showing that the BOP was grossly negligent in treating Mr. Ates's COVID symptoms in August 2020.

In sum, the record demonstrates that when Mr. Ates had COVID in August 2020, he was not at high risk for hospitalization or other severe COVID complications. Instead, he briefly experienced symptoms commonly associated with COVID that were usually left untreated. Regarding the treatment provided by the BOP, Mr. Ates has not shown an "intentional failure to perform a duty in reckless disregard of the consequences." *McGowen*, 152 N.E.3d at 661.

### 2. December 2020 forward

Mr. Ates next argues that the BOP failed to treat his COVID-related symptoms and conditions from December 2020 forward, which led to long COVID or lasting lung dysfunction. The United States argues that it is entitled to summary judgment because Mr. Ates cannot show that the BOP was grossly negligent in treating him.

The designated evidence shows that BOP medical personnel examined Mr. Ates, including his breathing and lungs, on numerous occasions from December 2020 forward. Dkt. 130-1 at 91-92; 97-98; *see also* Dkt. 130-3 at 9; 12-13. On December 7, 2020, Mr. Ates was seen by Nurse K. Lubbehusen who examined Mr. Ates, took his vitals and temperature, and measured his respirations and oxygen saturation rate. Dkt. 130-3 at 9. Nurse Lubbehusen administered a rapid COVID 19 test, which was negative, and ordered a chest x-ray due to Mr. Ates's cough. *Id.* The chest x-ray was reviewed by a radiologist, Dr. Farhad Khorashadi, who observed, among other things, that Mr. Ates's "[l]ungs are clear." *Id.* Dr. Wilson reviewed the medical records

related to Mr. Ates's December 2020 medical visits and determined that no further follow-up was needed.  *Id.*

Dr. Wilson examined Mr. Ates during a chronic care clinical encounter on October 3, 2023.  *Id.* at 11.  He reviewed Mr. Ates's charts, medications, and radiology reports, and discussed with him his "various chronic conditions." *Id.* Dr. Wilson's medical records reflect that during that visit, Mr. Ates "denies any chest pain" and had "no major complaints". *Id.*  Dr. Wilson also measured Mr. Ates's respirations, oxygen saturation rate, and conducted a physical examination which included examining Mr. Ates's chest. *Id.*  Mr. Ates's breathing sounded normal, and Dr. Wilson ordered a chest x-ray and EKG as part of a routine screen.  *Id.*

On November 3, 2023, Mr. Ates was seen by Nurse Murphee in response to a sick call request.  *Id.* at 12.  Mr. Ates complained of being short of breath. Nurse Murphee took his vitals, measured his respirations and oxygen saturation, listened to his breathing, and performed an EKG. *Id.*  Mr. Ates had a chest x-ray on November 9, 2023, which was read by Dr. Justin Yoon. *Id.* Dr. Yoon's notes recorded, among other things, that Mr. Ates's "lungs are clear." *Id.*

On March 19, 2024, Mr. Ates was examined by FNP Frank for a chronic care evaluation.  *Id.* at 12.  During that visit, FNP Frank discussed with Mr. Ates his "various chronic issues." *Id.*  FNP Frank listened to Mr. Ates's

breathing and did not observe any coughing, shortness of breath, or other symptoms of lung dysfunction. *Id.* Dr. Wilson co-signed this exam.

Mr. Ates contends that he has lung damage caused by long COVID, and the BOP did not sufficiently treat his condition. He has not, however, designated an expert opinion that he has lung damage and even if he did, he has not designated an expert opinion that any lung damage was caused by the BOP's treatment of his COVID symptoms in August 2020 as he alleges. Without expert opinions, Mr. Ates cannot show that he has any lung, or other chronic condition, was caused by his COVID infection in August 2020. *See Torres v. City of Chicago*, 2015 WL 12843889, *8 (N.D. Ill. 2015) ("A lay witness 'cannot, however, offer medical opinions that require scientific, technical, or other specialized knowledge,' 'give any complex medical diagnoses or opine on any long term medical conditions.'") (citations omitted); *Culbertson v. Mernitz*, 602 N.E.2d 98, 104 (Ind. 1992) ("We therefore hold that, except in those cases where deviation from the standard of care is a matter commonly known by lay persons, expert medical testimony is necessary to establish whether a physician has or has not complied with the standard of a reasonably prudent physician.").

Moreover, Mr. Ates has not designated evidence from which a jury could find that USP Terre Haute officials engaged in "'[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to [Mr. Ates].'" *N. Ind. Pub. Serv. Co.*, 790 N.E.2d at 465-466. This applies as well to Mr. Ates's sleep apnea, to the extent Mr. Ates argues that the BOP was negligent in treating that

condition.  The designated evidence shows that Mr. Ates was consistently seen by BOP medical staff, both for regularly scheduled "chronic care" examinations and in response to complaints of specific symptoms.  During these appointments, medical staff routinely took his vitals, measured his respirations and oxygen saturation, and listened to his breathing.  There were also multiple instances when various medical staff ordered and reviewed x-ray images of Mr. Ate's chest and lungs and concluded that neither the images nor Mr. Ate's symptoms warranted referral to a pulmonologist.

The designated evidence, including thousands of pages of Mr. Ates' medical records, the declaration of Dr. Wilson, the x-ray images, and Mr. Ates' deposition testimony and discovery responses, was reviewed by Defendant's expert, Dr. Wurcel.  Dr. Wurcel opined that the BOP's medical treatment of Mr. Ates from December 2020 forward was "evidence-based, guideline-concordant medical care".  Dkt. 130-5 at 6.  In reaching this conclusion, she further opined that she "would not classify Mr. Ates as having 'severe debilitating lung damage.'" *Id.* Considering Dr. Wurcel's opinions, no reasonable jury could find an "intentional failure to perform a duty in reckless disregard of the consequences" with respect to the BOP's treatment of Mr. Ates's medical conditions from December 2020 forward. *McGowen*, 152 N.E.3d at 661.

Mr. Ates argues that Dr. Wurcel's expert opinion on whether Mr. Ates has lung dysfunction is not reliable and should not be considered because Dr. Wurcel is not qualified to offer such opinion.  Specifically, "Dr. Wurcel admitted that

25

lung dysfunction is not within her expertise, and that if any of her infectious disease patients have breathing issues she refers them out to a pulmonologist for evaluation." Dkt. 143 at 15 (Mr. Ates's summary judgment brief).

Federal Rule of Evidence 702 requires the Court to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The Court has broad discretion in making a determination on the admissibility of expert testimony and is not required to resolve any factual issues in favor of the non-moving party simply because the issue has arisen in the context of a motion for summary judgment. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997). *See also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). The proponent of expert testimony bears the burden of demonstrating its admissibility. *Id.* at 705.

The Court must engage in a three-step analysis when fulfilling its "gatekeeping obligation" under Rule 702 and determine: "whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett–Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers*, 629 F.3d at 644). "'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'" *Gayton v. McCoy*, 593 F.3d 610, 616

(7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990)). "'Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.'" *Id.* at 617 (quoting *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992)). Ultimately, "[t]he question [the Court] must ask is not whether an expert witness is qualified in general, but whether h[er] qualifications provide a foundation for h[er] to answer a specific question." *Id.*

Here, Dr. Wurcel's testimony and expert materials, dkt. 130-5, establish that she is an experienced physician licensed to practice internal medicine and treat infectious diseases.  Through her training and experience, she is able to recognize symptoms of severe lung damage that would require a referral to a specialist, like a pulmonologist.  She testified, "I know when someone has severe lung damage. I mean, in terms of their oxygenation saturation, in terms of lots of other things, an internal medicine doctor can know when someone has severe lung damage." *Id.* at 101.  Explaining the basis for such knowledge, Dr. Wurcel testified:

> I guess, like, this is the existential infectious diseases debate that you get into, in that we are doctors of everything. And if there's an infection of the lungs, it's called a pneumonia, and COVID causes, in some people, an infection of the lungs. And so, like, I'm not a lung doctor, but I am a lung doctor when an infection is in it. So any infection hits the lungs, then I'm a lung doctor.

*Id.* at 94. She further explained that "you don't send every person that believes they have something to a specialist. The internal medicine doctor has a certain level of understanding to triage." *Id.* at 97.  Dr. Wurcel further testified: "I would be surprised if [the BOP] got pulmonary function tests because the original chest x-ray and the original – [Mr. Ates] never had any evidence of low oxygenation other than during the obstructive sleep apnea episodes, and so the pulmonary functions test wouldn't recreate, like, the sleep situation." *Id.* at 82.  Moreover, from her clinical experience, a patient would only be referred for a pulmonary functions test after a diagnosis of asthma or observable symptoms like "intractable coughing [] wheezing or rhonchi or something else."  Dkt. 144-2 at 82. Dr. Wurcel explained that internal medicine doctors are ordinarily the source of referrals to pulmonologists, that is, patients are referred after an internist observes signs of lung damage/dysfunction.  Dkt. 144-2 at 99.

Here, from the medical records, Dr. Wurcel observed multiple exams when Mr. Ates's lungs were clear and his pulse oximetry readings were good. *Id.* at 91. Dr. Wurcel further opined that from these and other objective symptoms documented in the medical records, "any internal medicine doctor would look at this case and say this man does not have severe lung damage."  *Id.* at 98.

While Dr. Wurcel is not a pulmonologist and does not hold herself out to be a specialist on lung dysfunction, her training and experience provide sufficient foundation for her to opine that, based her review of Mr. Ates's deposition transcript, discovery responses, and medical records, dkt. 103-5, Mr.

Ates did not have severe lung damage. *Gayton*, 593 F.3d at 617.  This opinion supports her conclusion that the BOP provided Mr. Ates "evidence-based, guideline concordant medical care".  As Dr. Wurcel aptly explained, internal medicine doctors like her regularly make the initial assessment as to whether a patient has symptom that warrant referral to a specialist, such as a pulmonologist. Dr. Wurcel unequivocally opined both in her written report and during her deposition that, based on information in Mr. Ates's medical records, she saw no indication that he did in fact have lung damage, or any basis for referring him to an outside specialist for further evaluation.

Mr. Ates contends that Dr. Wurcel did not know about or did not take into consideration his claim that his medical records often failed to reflect his complaints of breathing problems. Even accepting Mr. Ates's claim at face value, as the Court must on summary judgment, it does not warrant rejection of Dr. Wurcel's opinions. It was made clear during Dr. Wurcel's deposition that objective evidence, such as Mr. Ates's oxygenation levels and x-rays, supported her conclusion that he did not have lung damage or need to be referred to an outside specialist for further testing. Mr. Ates also admitted during his deposition that he only put in two healthcare requests directly related to complaints of difficulty breathing. Moreover, after Dr. Wurcel had written her original report, she submitted a declaration stating that even after reviewing Mr. Ates's deposition, wherein he stated that his medical records did not accurately reflect

his repeated complaints of breathing problems, she adhered to the opinions stated in her expert report. Dkt. 130-5 at ¶ 4.

Finally, the Court notes that it is not always entirely clear whether Mr. Ates is seeking to pursue claims of inadequate medical treatment specifically related to breathing difficulties, or whether he more generally asserts that he has long COVID and needs to be treated accordingly.[1] In either case, Mr. Ates presents no expert testimony as to what different treatment he should be receiving. In part, he continues to argue that his sleep apnea could be related to having long COVID. But, if it is, it also is undisputed that that condition is being adequately addressed by USP medical staff and through the provision of a CPAP machine.

In sum, Mr. Ates has not designated evidence from which a jury could find that USP Terre Haute medical personnel engaged in "'[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to [Mr. Ates].'" *N. Ind. Pub. Serv. Co.*, 790 N.E.2d at 465-466.  The United States is therefore entitled to summary judgment on Count 3 of the complaint.

**IV.**
**Conclusion**

Defendant's motion for summary judgment is **GRANTED**. Dkt. [130]. Final judgment shall now issue, consistent with this Order and the Court's order partially granting Defendant's motion to dismiss, dkt. 43.

---

[1] Mr. Ates during his deposition mentioned having "brain fog," which he also contends might be a sign of long COVID. Dkt. 130-1 at 93.

**SO ORDERED.**

Date: 12/5/2025

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

ROY EDWARD ATES, JR.
88532-380
TERRE HAUTE - FCI
TERRE HAUTE FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 33
TERRE HAUTE, IN 47808